1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   7-ELEVEN, INC. and TSC LENDING
     GROUP, INC.,
11
                    Plaintiffs,                    No. 12-CV-02276-KJM-GGH
12
            vs.
13
     BRINDERJIT DHALIWAL,
14
                    Defendant.                          ORDER
15   _____/

16          This case was on the court's calendar on October 26, 2012 for argument on the

17   motion for a preliminary injunction brought by plaintiffs 7-Eleven and TSC Lending Group, Inc.

18   (collectively, "7-Eleven").  As explained below, the court grants 7-Eleven's motion for a

19   preliminary injunction.

20   I.     Background

21          7-Eleven "operates, franchises and licenses more than 8,800 7-Eleven® stores in

22   North America."  (Hower Decl. ¶ 12, ECF 10.)  7-Eleven has registered with the Principal

23   Register of the United States Patent and Trademark Office several marks that may be used by its

24   franchisees in conjunction with operation of 7-Eleven franchises.  (*Id.* ¶¶ 19-23.)

25          On March 17, 1997, defendant Brinderjit Dhaliwal entered into a franchise

26   agreement with 7-Eleven (the "Roseville Franchise Agreement") to operate 7-Eleven store

1

#2235-21290D in Roseville, California (the "Roseville Store").  (Dhaliwal Decl. ¶ 2, ECF 18-1; Roseville Franchise Agreement, Ex. A, ECF 18-2.)  During his operation of the Roseville Store, Dhaliwal enjoyed business success, and also was active in national and regional 7-Eleven Franchise Owner Associations, working with 7-Eleven management to improve store processes and management generally.  (Dhaliwal Decl. ¶¶ 4-5, ECF 18-1.)  When the lease agreement between 7-Eleven and the owner of the Roseville Store property ended in or around February 2010, the property owner chose not to renew the lease, causing the Roseville Franchise Agreement to terminate prematurely.  (*Id.* ¶ 7, ECF 18-1.)  A provision of the Roseville Franchise Agreement allowed Dhaliwal to elect within 180 days of the termination either a refund of part of his franchise fee or to transfer to "any 7-Eleven Store [Dhaliwal] select[s] . . . which is available for franchise . . . which has been open for business as a 7-Eleven Store for at least twelve (12) months" without paying a new franchise fee.  (Roseville Franchise Agreement ¶ 26(e), Ex. B, ECF 18-3.)  Dhaliwal informed 7-Eleven that he was interested in transferring to "any reasonable location in the greater Northern California area." (Dhaliwal Decl. ¶¶ 10-11, ECF 18-1.) In a May 10, 2010 email to 7-Eleven President and CEO Joseph DePinto, Dhaliwal explained that David Huey, the former Vice President of 7-Eleven's Northwest Division, had told Dhaliwal that he could move to a new 7-Eleven store in Roseville, but that the store was never constructed.  (*Id.* ¶ 12; Ex. C, ECF 18-4.)  Additionally, Dhaliwal informed DePinto he had communicated with Market Manager Chuck Kronyak regarding a store being built in Sacramento, California and that Kronyak had told him "they are considering someone else for a second store for that location."  (*Id.*)

In June 2010, Dhaliwal met with Kronyak, Franchise Sales Representative Tony Varela and Division Vice President Larry Hughes to discuss transferring to another store. (Dhaliwal Decl. ¶ 15, ECF 18-1; Varela Decl. ¶ 4, ECF 21.)  Dhaliwal was told that there were no corporate 7-Eleven stores available for franchise in Northern California and he was unwilling to pay the purchase prices that independent 7-Eleven franchise owners were requesting for their

stores.  (Varela Decl. ¶ 4, ECF 21.)  He stated he would be unwilling to move to another region

that had corporate stores available for franchise.  (*Id*.)  In August 2010, Dhaliwal reiterated his

interest in transferring to 7-Eleven Franchise Sales Manager Gary Griffith, who sent Dhaliwal a

list of 7-Eleven stores in Northern California that were available for franchise.  (*See* Dhaliwal

Decl. ¶ 16; Exs. F-G, ECF 18-4.)

On December 3, 2010, Dhaliwal entered into a second franchise agreement with

7-Eleven to operate 7-Eleven Store No. 2364-34671A in Rocklin, California (the "Rocklin

Store").  (Hower Decl. ¶ 3, ECF 10; Rocklin Franchise Agreement, Ex. A, ECF 10-1.)  7-Eleven

leased the land and provided Dhaliwal with all the equipment and infrastructure necessary for the

operation of the store, as well as authorization to use 7-Eleven's registered marks.  (Hower Decl.

¶¶ 4-5, ECF 10.)  In exchange for running the Rocklin Store, Dhaliwal was entitled to the store's

weekly net income.  (Rocklin Franchise Agreement at 26, Ex. A, ECF 10).  As the Rocklin Store

was a new store, (Varela Decl. ¶ 5, ECF 21), it was ineligible for the franchise fee waiver under

the Roseville Franchise Agreement, which 7-Eleven clarified at hearing.  Dhaliwal paid a

franchise fee of $219,400.  (Dhaliwal Decl. ¶ 24, ECF 18-1.)  Dhaliwal asserts that "[h]ad

7-Eleven permitted [him] to simply transfer to the Rocklin Store, or to a different store, [he]

would not have needed to pay a franchise fee." (*Id*. ¶ 26.)

Dhaliwal alleges that before he entered into the Rocklin Franchise Agreement

Kronyak and Griffith told him he could expect $1,100,000 in annual sales for the Rocklin Store.

(*Id*. ¶ 21.)  7-Eleven disputes that Dhaliwal was given this figure, and notes that the business

plan Dhaliwal prepared for the Rocklin Store states he expected $1,239,000 in sales during the

first year – "near the market average" – and $1,300,000 thereafter.  (Pls.' Reply in Supp. of Mot.

for Prelim. Inj. at 5, ECF 20; Business Plan, Ex. H at 14, ECF 18-5.)  In 2011, the Rocklin Store

instead had approximately $550,000 in sales (Dhaliwal Decl. ¶ 27, ECF 18-1) and suffered a loss

of $32,453 (*id. ¶* 31).

/////

The Rocklin Franchise Agreement required Dhaliwal to maintain a net worth of at least $15,000 at all times.  (Rocklin Franchise Agreement at 29, Ex. A, ECF 10.)  The reason for the net worth requirement, as clarified at hearing, was to ensure that the franchisee was fully invested in the operation of the store.  The Rocklin Store's net worth on November 30, 2011 was negative $1936.  (Hower Decl. ¶ 24, ECF 10.)  On December 20, 2011, 7-Eleven sent Dhaliwal a "Notice of Material Breach" stating that Dhaliwal had three business days to remedy the Rocklin Store's net worth before 7-Eleven would terminate the Rocklin Franchise Agreement.  (*Id.* ¶ 25, ECF 10 & Ex. D, ECF 10-2.)  Dhaliwal was able to raise the net worth of the Rocklin Store by the deadline.  (Hower Decl. ¶ 25.)  However, the Rocklin Store's net worth again fell below $15,000 and 7-Eleven sent Dhaliwal several more Notices of Material Breach between February and June 2012.  (*Id.* ¶¶ 26-31, ECF 10 & Exs. F, H & J, ECF 10-2.)  In response to these notices, Dhaliwal did not raise the Rocklin Store's net worth.  (Hower Decl. ¶¶ 26-31, ECF 10.)  As of July 31, 2012, the Rocklin Store's net worth was a negative $31,836.08.  (*Id.* ¶ 32, ECF 10.)  7-Eleven sent Dhaliwal its last Notice of Material Breach on August 13, 2012 and terminated the Rocklin Franchise Agreement on August 17, 2012, "[a]s a result of [Dhaliwal's] chronic failure to maintain the required minimum net worth."  (*Id.* ¶ 33, ECF 10.)

Dhaliwal continues to operate the Rocklin Store.  (Dhaliwal Decl. ¶ 33, ECF 18-1; Hower Decl. ¶¶ 34-36, ECF 10.)  He currently uses 7-Eleven's marks and offers 7-Eleven products.  (Hower Decl. ¶ 37, ECF 10.)  Dhaliwal maintains that he operates the Rocklin Store "in a cleanly manner and . . . follow[s] 7-Eleven processes."  (Dhaliwal Decl. ¶ 33, ECF 18-1.)  Moreover, it is undisputed that "[t]he Rocklin Store is inspected on a weekly and monthly basis by a 7-Eleven field consultant, and the store consistently has exceptional marks in all evaluated categories, including cleanliness, planning, execution and guest focus," with its most recent marks received on October 10, 2012.  (Dhaliwal Decl. ¶ 34, ECF 18-1; Store Evaluation Reports, Ex. J, ECF 18-5.)

/////

1    On September 4, 2012, 7-Eleven filed suit against Dhaliwal, alleging that he

2  breached the Rocklin Franchise Agreement by allowing the Rocklin Store's net worth to fall

3  below $15,000 (ECF 1 ¶ 42) and that his continued use of 7-Eleven's marks constitutes

4  trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1) and

5  1125(a) (*id.* ¶¶ 62, 67), as well as violations of California's Unfair Competition Law, Cal. Bus.

6  & Prof. Code § 17200 (*id.* ¶¶ 72-73).  Dhaliwal filed a counterclaim for breach of contract,

7  intentional misrepresentation, and negligent misrepresentation against 7-Eleven on September

8  27, 2012. (Def.'s Ans. & Counterclaim, ECF 15.)

9    On September 25, 2012, 7-Eleven filed a motion for preliminary injunction. (Mot.

10  for Prelim. Inj., ECF 8.)  Dhaliwal filed his opposition on October 12, 2012 (ECF 18) and

11  7-Eleven filed its reply on October 19, 2012 (ECF 20).[1]  7-Eleven requests that Dhaliwal be

12  ejected from the Rocklin Store, be enjoined from using the 7-Eleven marks or holding himself

13  out as a 7-Eleven franchise, and that he deliver items with 7-Eleven's marks to 7-Eleven.  (Mot.

14  for Prelim. Inj., ECF 8.)

15  II.    Analysis

16    As provided by Federal Rule of Civil Procedure 65, a court may issue a

17  preliminary injunction to preserve the relative position of the parties pending a trial on the

18  merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking

19  injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer

20

---

21    [1] 7-Eleven filed several exhibits, including the declaration of Tony Varela and a second
declaration of Norman Hower, in support of its reply. (ECF 21; ECF 22.)  Dhaliwal objects to

22  the declarations to the extent they concern matters not addressed in 7-Eleven's opening brief and
also makes evidentiary objections to specific portions of the declarations.  (ECF 23.)  The court

23  does not consider those portions of the declarations introducing new matters.  *See Am. Civil
Liberties Union of Nevada v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1071 (D. Nev. 1998)

24  ("When new evidence is submitted with a reply brief, the court should not consider the new
evidence without giving the non-moving party an opportunity to respond.") (citing *Provenz v.*

25  *Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)).  As the court also does not rely on the portions of
the declarations to which Dhaliwal makes evidentiary objections, the court need not resolve

26  those objections.

1   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

2   and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*,

3   555 U.S. 7, 20 (2008); *Munaf v. Green*, 553 U.S. 674, 689-90 (2008).

4           Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or

5   "serious question" test, which allowed a court to balance the elements of the test "so that a

6   stronger showing of one element may offset a weaker showing of another." *See Clear Channel*

7   *Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). Recently, the Circuit

8   found that its sliding scale test survived *Winter*: a court may issue a preliminary injunction when

9   a plaintiff raises serious questions going to the merits and demonstrates that the balance of

10  hardships tips sharply in his favor, so long as the court also considers the remaining two prongs

11  of the *Winter* test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

12  2011).

13          A.      Likelihood of Success on the Merits

14          To obtain injunctive relief, 7-Eleven must demonstrate it is likely to succeed on

15  its breach of contract and Lanham Act claims. Demonstrating a likelihood of success on the

16  breach claim is necessary to eject Dhaliwal from the Rocklin Store because under the Rocklin

17  Franchise Agreement, Dhaliwal's breach terminates his right to occupy the Rocklin Store. (*See*

18  Rocklin Franchise Agreement at 25, Ex. A, ECF 10.) 7-Eleven's remaining requests for

19  injunctive relief require 7-Eleven to show it is likely to succeed on its claim that Dhaliwal is

20  violating the Lanham Act, which also depends on showing a likelihood of success on the breach

21  claim. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998) (explaining

22  that the first step to enjoin a former franchisee's use of the franchisor's marks based on

23  trademark infringement is to show that the franchise agreement was properly terminated); *see*

24  *also Century 21 Real Estate LLC v. All Prof'l Realty, Inc*., No. CIV. 2:10-2846, 2011 WL

25  221651, at *8 (E.D. Cal. Jan. 24, 2011). The court finds that 7-Eleven has established a

26  /////

                                                    6

1  likelihood of success on the merits for its Lanham Act and breach of contract claims, as

2  discussed below.

3              1.      Breach of the Rocklin Franchise Agreement

4              7-Eleven contends that Dhaliwal breached the Rocklin Franchise Agreement by

5  allowing the Rocklin Store's net worth to fall below $15,000.  (Am. Mem. of P. & A. in Supp. of

6  Mot. Prelim. Inj. at 21, ECF 13.)  Dhaliwal argues 7-Eleven will not succeed on its claim for

7  breach of the Rocklin Franchise Agreement because any failure on his part to maintain the

8  minimum net worth was a direct result of 7-Eleven's refusal to let him transfer to the Rocklin

9  Store without paying a transfer fee, in breach of the Roseville Franchise Agreement. (Def.'s

10  Opp'n to Pl.'s Mot. Prelim. Inj., ECF 18 at 10.)  Additionally, Dhaliwal argues that Kronyak's

11  and Griffith's representations about the Rocklin Store's sales constitute fraudulent inducement

12  and mutual mistake and that he would have been able to maintain the minimum net worth if the

13  Rocklin Store's sales had been as high as he had been told he could anticipate before entering

14  into the Rocklin Franchise Agreement.  (*Id*. at 10-11.)

15              While the court is sympathetic to Dhaliwal's frustration with 7-Eleven's declining

16  under the circumstances to accommodate his move to a store of his choice without payment of a

17  transfer fee, 7-Eleven did not breach the Roseville Franchise Agreement.  After the Roseville

18  Store closed, 7-Eleven offered Dhaliwal the opportunity to transfer to a store in a different region

19  without paying a franchise fee.  But because of his desire to stay in Northern California,

20  Dhaliwal chose not to transfer to those stores.  Dhaliwal entered into the Rocklin Franchise

21  Agreement to operate a new store after determining he could not afford to pay the purchase price

22  for existing franchises in Northern California.  Although Dhaliwal believed that 7-Eleven should

23  have waived the Rocklin Store franchise fee, 7-Eleven was not obligated to do so under the

24  Roseville Franchise Agreement transfer provision, which stated that the fee would be waived for

25  transfer only to stores that had been open for a year or more.  Finally, Dhaliwal has alleged no

26  /////

1  facts in support of his argument that 7-Eleven was deliberately making stores unavailable for

2  transfer in order to earn franchise fees.  (*See id.* at 10.)

3          Even disregarding 7-Eleven's assertions that Dhaliwal was never told the Rocklin

4  Store would earn $1,100,000 in yearly sales, Dhaliwal's allegations are unlikely to form the

5  basis for an affirmative defense of fraudulent inducement.  In California, "[t]he elements of fraud

6  are (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or

7  knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting

8  damage." *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 294 (2005).  While Dhaliwal

9  argues that 7-Eleven's statements regarding the Rocklin Store's profits were false and that he

10  reasonably relied on them, he does not allege that 7-Eleven knew the figures were inaccurate.

11  Similarly, Dhaliwal has not provided any facts to support an affirmative defense of mutual

12  mistake, which requires showing "the failure of the written contract to express the intention of

13  the parties . . . due to the inadvertence of both of [the parties]." *Lemoge Elec. v. San Mateo*

14  *County*, 46 Cal. 2d 659, 664 (1956).  Therefore, as Dhaliwal currently frames his affirmative

15  defenses, they are not sufficient to overcome 7-Eleven's showing that it is likely to succeed on

16  its action for breach.

17          2.      Violations of the Lanham Act

18          To show that Dhaliwal is infringing 7-Eleven's registered trademarks in violation

19  of the Lanham Act, 7-Eleven must show that Dhaliwal's use of its protected marks is both

20  unauthorized and likely to cause confusion.  *See Applied Info. Sciences Corp. v. eBay, Inc.*, 511

21  F.3d 966, 969-71 (9th Cir. 2007); *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020, 1025

22  (C.D. Cal. 2011).  A franchisee's use of the franchisor's marks is unauthorized if the franchisor

23  properly terminated the franchise agreement.  *McDonald's Corp.*, 147 F.3d at 1308; *Wetzel's*

24  *Pretzels*, 797 F. Supp. 2d at 1025.  California Business and Professions Code Section 20020

25  provides that a franchisor may terminate a franchise agreement for good cause, which includes

26  "the failure of the franchisee to comply with any lawful requirement of the franchise agreement

8

1   after being given notice thereof and a reasonable opportunity, which in no event need be more

2   than 30 days, to cure the failure."  Based on the court's determination that 7-Eleven is likely to

3   succeed on its claim that Dhaliwal breached the Rocklin Franchise Agreement, along with

4   7-Eleven's repeated notices and opportunities for Dhaliwal to cure the breach, 7-Eleven properly

5   terminated the Rocklin Franchise Agreement.  Dhaliwal does not dispute that his use of

6   7-Eleven's marks constitutes trademark infringement assuming the Rocklin Franchise

7   Agreement was properly terminated.  As 7-Eleven is likely to succeed on its claim for breach,

8   the court finds that 7-Eleven has shown a likelihood of prevailing on the merits of its claims

9   under the Lanham Act.

10          B.      Likelihood of Irreparable Harm in Absence of Granting Preliminary Injunction

11                  7-Eleven asserts it is likely to suffer two types of irreparable harm if Dhaliwal

12   continues to occupy the Rocklin Store.  First, 7-Eleven argues Dhaliwal's continued occupation

13   of the property interferes with 7-Eleven's property rights.  (Am. Mem. of P. & A. in Supp. of

14   Mot. Prelim. Inj. at 18-19, ECF 13.)  7-Eleven contends that as a breach of the Rocklin Franchise

15   Agreement is also a breach of the lease agreement for the Rocklin Store, Dhaliwal's use of the

16   property constitutes trespass. (*Id.*; Rocklin Franchise Agreement ¶ 8(e), Ex. A, ECF 10.)  Under

17   California law, "[e]very piece of property is unique and thus damages are an insufficient remedy

18   to the denial of property rights." *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,

19   218 F. Supp. 2d 1203, 1230 (C.D. Cal. 2002) (granting preliminary injunction restraining

20   eminent domain proceedings).  In addition, a former franchisee's continued occupation of the

21   franchise after the franchise agreement has terminated can cause irreparable harm because the

22   franchisor may no longer make productive use of his property.  *See Southland Corp. v. Froelich*,

23   41 F. Supp. 2d 227, 242-43 (E.D.N.Y. 1999).  Here, 7-Eleven is likely to suffer irreparable harm

24   if Dhaliwal is allowed to remain in the Rocklin Store.

25                  7-Eleven also argues it will suffer irreparable harm unless Dhaliwal is enjoined

26   from continuing to use its marks.  Although establishing a likelihood of success in a trademark

infringement once created a presumption that the party seeking a preliminary injunction would suffer irreparable harm, *see, e.g., Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999), recent Ninth Circuit cases have called into question whether this presumption is consistent with Supreme Court pronouncements.  In *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006), the Supreme Court held that a court should not adopt a categorical approach and presume irreparable harm based on a plaintiff's showing of likelihood of success on the merits in a patent infringement claim, when considering whether to grant a permanent injunction; the Court in *eBay* emphasized the equitable nature of a court's role in determining questions of injunctive relief, explaining that courts must apply the "traditional four-factor framework that governs" such questions.  Several years after *eBay*, the Ninth Circuit nonetheless upheld a district court's grant of a preliminary injunction where the district court presumed irreparable harm after the plaintiff showed it was likely to succeed on its trademark infringement claim.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009).  However, the Ninth Circuit has stated in a more recent case that presuming irreparable harm was inappropriate under *eBay* when considering a preliminary injunction in the copyright infringement context.  *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 998 (9th Cir. 2011).  In reviewing the applicability of *Marlyn Nutraceuticals*, the *Flexible Lifeline* court stated: "The [*Marlyn Nutraceuticals*] panel's summary treatment of the presumption without consideration of the effect of *eBay* and *Winter* does not bind this panel or constitute an affirmation of the presumption's continued vitality. '[S]tatements made in passing, without analysis, are not binding precedent.'"  *Id.* at 997 (quoting *Thacker v. FCC (In re Magnacom Wireless, LLC*), 503 F.3d 984, 993-94 (9th Cir. 2007)).

While *Flexible Lifeline* did not directly address the impact of *eBay* on courts' power to presume irreparable harm in trademark infringement cases, it is likely that using a presumption in this situation is inappropriate.  *See Leatherman Tool Group, Inc. v. Coast Cutlery Co.*, 823 F. Supp. 2d 1150, 1157 (D. Or. 2011) ("While the holding in *Flexible Lifeline* applied

10

to copyright infringement cases, there is no language in the court's rationale that would indicate a different standard for other types of cases."). *See also Century 21 Real Estate LLC*, 2011 WL 221651, at *12 (decided before *Flexible Lifeline*) ("[T]he viability of the presumption of irreparable harm caused by trademark infringement is at best still an open question.").

Without a presumption of irreparable harm, 7-Eleven must provide evidence that it will suffer irreparable harm if Dhaliwal continues to occupy the Rocklin Store. *See Meyer v. Portfolio Recovery Assocs., LLC*, 696 F.3d 943, 951 (9th Cir. 2012) (regardless of whether the presumption of irreparable harm applies, the court could grant a preliminary injunction if all four factors of the *Winters* test are satisfied); *Century 21 Real Estate LLC*, 2011 WL 221651, at *12. 7-Eleven argues that its "loss of control" over its trademarks and the likelihood that customers will be confused by Dhaliwal's use of the trademarks establish irreparable injury. (Pls.' Reply in Supp. of Mot. Prelim. Inj., ECF 20 at 6-8.) Dhaliwal argues that his exemplary management of the Rocklin Store and compliance with 7-Eleven's standards means that 7-Eleven will not suffer damage to its goodwill or reputation. (Def.'s Opp'n to Pl.'s Mot. Prelim. Inj., ECF 18 at 12.)

7-Eleven's lack of control over its trademarks due to Dhaliwal's unauthorized use is enough to show irreparable harm. *Wetzel's Pretzels, LLC*, 797 F. Supp. 2d at 1028 (stating that even absent a presumption of irreparable harm from a showing of likelihood of success on the merits, a former franchisee's continued use of the franchisor's marks demonstrated irreparable harm). *See also Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011); *TGI Friday's Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d 763, 771 (N.D. Tex. 2009). Contrary to Dhaliwal's assertions, 7-Eleven does not need to show Dhaliwal will take actions through his management of the Rocklin Store that will damage 7-Eleven's goodwill or reputation; regardless of the care that Dhaliwal takes while running the store, 7-Eleven still has the right to maintain control over its trademarks to prevent customer confusion. *Id.* at 772 ("Courts have held that a franchisor suffers a risk of injury to its reputation and the value of its marks even if the alleged infringer offers superior services.").

C.      Balance of Equities

7-Eleven argues that the balance of equities weighs in its favor because Dhaliwal's unauthorized use of its marks and occupation of its property cannot be compensated monetarily.  (Am. Mem. P. & A. in Supp. Mot. Prelim. Inj., ECF 13 at 44.) Dhaliwal argues that if the preliminary injunction is granted, "he would suffer monetarily in the way of lost revenue and also the goodwill he has built with the store in the community." (Def.'s Opp'n to Pl.'s Mot. Prelim. Inj., ECF 18 at 14.)  The court finds that 7-Eleven's inability to control its marks and its own goodwill overcomes the harm to Dhaliwal who at this point is an unlicensed operator; the injury to Dhaliwal at this point can be addressed satisfactorily through money damages.  *See Wetzel's Pretzels*, 797 F. Supp. 2d at 1029 (finding that potential harm to franchisor's goodwill and reputation outweighed likely financial injury to franchisee).  The court finds that this factor favors 7-Eleven.

D.      The Public Interest

"In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused."  *Id.* (quoting *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009)).  The court finds that granting an injunction preventing Dhaliwal's unlicensed use of 7-Eleven's marks is in the public interest.

E.      Bond

Under Federal Rule of Civil Procedure 65(c), the court may grant a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, neither party has presented evidence of the appropriate amount for the bond. The "bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  On the record before it, the court will not require 7-Eleven to post a bond before the injunction takes effect.

1    The Motion for Preliminary Injunction (ECF 8) is GRANTED insofar as pending

2  a trial on the merits:

3    1)    Defendant, his agents, servants and employees, and those people in active

4  concert or participation with defendant are ordered to surrender possession to 7-Eleven and are

5  ejected from the premises and facilities at 6001 Stanford Ranch Road, Rocklin, California;

6    2)    Defendant, his agents, servants and employees, and those people in active

7  concert or participation with defendant are enjoined and restrained from:

8    a. Using the 7-Eleven Marks or any trademark, service mark, logo or

9  trade name that is confusingly similar to the 7-Eleven Marks;

10    b. Otherwise infringing the 7-Eleven Marks or using any similar

11  designation, alone or in combination with any other components;

12    c. Passing off any of their products or services as those of 7-Eleven's or

13  7-Eleven's authorized franchisees;

14    d. Causing a likelihood of confusion or misunderstanding as to the source

15  or sponsorship of their businesses, products or services;

16    e. Causing a likelihood of confusion or misunderstanding as to their

17  affiliation, connection or association with 7-Eleven and its franchisees or any of 7-Eleven's

18  products or services; and

19    f. Unfairly competing with 7-Eleven or its franchisees, in any manner;

20    3)    Under 15 U.S.C. § 1118, all labels, signs prints, packages, receptacles,

21  logo items, and advertisements, bearing the 7-Eleven Marks, in the possession of defendant, his

22  agents, servants and employees, and those people in active concert or participation with

23  defendant, must be delivered to 7-Eleven at defendant's cost.

24    This order shall take effect immediately.

25  DATED:  November 20, 2012.

26

_____
UNITED STATES DISTRICT JUDGE

13